F I L E D
Clerk
District Court

AUG 14 2023

for the Northern Mariana Islands
By_____
*JP*
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| NICHOLAS YAROFALCHUW,<br><br>Plaintiff,<br><br>v.<br><br>JOHN CABRERA and DANNY FITIAL,<br><br>Defendants. | Civil Case No. 1:22-cv-00001<br><br>**MEMORANDUM DECISION DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT and RECONSIDERATION, AND GRANTING DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT and RECONSIDERATION** |

Plaintiff Nicholas Yarofalchuw ("Yarofalchuw") moved for summary judgment ("MSJ," ECF No. 15) asserting a 42 U.S.C. § 1983 civil rights cause of action for an unlawful seizure based on his warrantless arrest within his home and curtilage in violation of the Fourth Amendment.[1] Defendants are two Commonwealth of the Northern Mariana Islands ("CNMI") police officers, Sergeant John Cabrera ("Sgt. Cabrera") and Officer Danny Fitial ("Fitial") (collectively "Defendants"); they oppose Yarofalchuw's motion and assert their own cross motion for summary judgment ("Cross MSJ," ECF No. 20) claiming probable cause for the warrantless arrest outside Yarofalchuw's home and curtilage, and a defense of qualified immunity. At a hearing on the motions for summary judgment, the Court originally found no genuine dispute of material fact that there was an unlawful seizure but GRANTED Defendant Fitial's cross-motion on qualified

_____

[1] In his Complaint, Yarofalchuw asserts a single cause of action: deprivation of civil rights under 42 U.S.C. § 1983. (Compl. 3, ECF No. 1.) Under that cause of action, he claims that he was subject to an unreasonable seizure in violation of the Fourth Amendment *and* that he was subjected "to a deprivation of his liberty without due process of law, in violation of the Fourteenth Amendment[.]" (*Id*. at ¶¶ 17, 18.) Notwithstanding this latter claim, Plaintiff's MSJ focuses solely on the unreasonable seizure cause of action, and at the September 1, 2022 hearing, Yarofalchuw clarified that he is not pursuing a Fourteenth Amendment due process claim.

immunity grounds. (Mins., ECF No. 28.) The parties were nevertheless ordered to file supplemental briefing on qualified immunity as applied to Defendant Sgt. Cabrera. (*Id.*) Defendant Sgt. Cabrera urges the Court to reconsider the Court's finding of an unconstitutional seizure (ECF No. 36) while Yarofalchuw seeks reconsideration of the Court's finding of qualified immunity as to Defendant Fitial (ECF No. 37). After initially taking the matters under advisement (Mins., ECF No. 43), the Court rendered its disposition at a status conference on December 1, 2022 (Mins., ECF No. 48).

At the status conference, the Court GRANTED Defendant Cabrera's motion for reconsideration (ECF No. 36) and found there was no unlawful seizure. Accordingly, Defendants' Cross-MSJ (ECF No. 20) was GRANTED, Yarofalchuw's MSJ (ECF No. 15) as to both Defendants was DENIED, and Yarofalchuw's motion for reconsideration as to granting judgment in favor of Defendant Fitial (ECF No. 37) based on qualified immunity was also DENIED. (Mins., ECF No. 48.) This memorandum decision now sets forth the Court's reasoning.

## I.  FACTUAL BACKGROUND

The facts below are derived from the parties' undisputed facts and their responses (ECF Nos. 44 - 47), which is in turn derived from numerous declarations. The Court relies on those facts that are undisputed by all parties. To the extent that a fact was not explicitly identified as disputed or undisputed, the Court will treat the fact as undisputed for purposes of the motion pursuant to Rule 56(e) of the Federal Rules of Civil Procedure. Where a part of a fact is disputed, the Court annotates as such.

On the evening of May 10, 2021, the Department of Public Safety ("DPS") received a 911 emergency phone call from Mr. James Roberto who was located at Tank Beach in Kagman, Saipan. (Decl. Jesse Sablan 2 ¶¶ 8-9, ECF No. 31-2; *compare* Cabrera's Undisputed Facts 6 ¶¶ 1, 2, ECF No. 45, *with* Yarofalchuw's Resp. 1 ¶¶ 1, 2, ECF No. 47 (undisputed).) Sgt. Cabrera quickly

responded to the call and found Mr. Roberto, a Turtle Field Survey Technician with the CNMI Department of Fish and Wildlife ("DFW"). (*Compare* Yarofalchuw's Undisputed Facts 7 ¶ 21, ECF No. 44 *with* Cabrera's Resp. 5 ¶ 21 (undisputed that Roberto reported a threat); Second Decl. Cabrera 2 ¶¶ 8-9, ECF No. 31-1; Decl. Jesse Sablan 2 ¶¶ 9-11.) Mr. Roberto informed Sgt. Cabrera that Yarofalchuw, accompanied by three other male individuals, threatened to shoot an alleged drone flying over Yarofalchuw's home and any DFW employee associated with said drone. (Second Decl. Cabrera ¶¶ 13, 14; Decl. Carlos Topulei 1 ¶¶ 4-5, ECF No. 31-5; Decl. Roberto 2 ¶¶ 26, 36-42, ECF No. 20-4.) This was apparently the second time in which Yarofalchuw threatened Mr. Roberto. (Decl. Roberto 2 ¶¶ 12-22.) Sgt. Cabrera left the scene to look for Yarofalchuw and his three companions. (Decl. Cabrera 2 ¶ 21, ECF No. 20-2.)

Shortly after his conversation with Mr. Roberto, Sgt. Cabrera reported to DPS Central "his arrival at a residence located along Niyoron Street, just east of Tank Beach" at 5:49 p.m.[2] (Decl. Sablan 2 ¶ 12; *compare* Def. Fitial's Undisputed Facts 4 ¶ 4, ECF No. 46, *with* Yarofalchuw's Resp. 4 ¶ 4 (undisputed).) Officer Fitial reported his arrival to the same residence just four minutes later (Decl. Sablan 2 ¶ 13), but left immediately after because, as admitted by Sgt. Cabrera, "no backup was necessary at this point." (Second Decl. Cabrera 2 ¶ 19; *compare* Fitial's Undisputed Facts 4 ¶ 6, *with* Yarofalchuw's Resp. 4 ¶ 6 (undisputed).)

According to Sgt. Cabrera, "[t]here were four men fitting the description of the individuals that were previously at Tank Beach sitting outside the residence drinking alcoholic beverages." (Second Decl. Cabrera 2 ¶ 18.) Initially, Sgt. Cabrera parked his vehicle by the table where the four individuals were seated and opened his driver's side window to speak with them. (*Id.* ¶ 21;

---

[2] The Court takes judicial notice of the conversion from military time as reflected in Sablan's declaration to regular time. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

*compare* Cabrera's Undisputed Facts 6-7 ¶¶ 3, 4, *with* Yarofalchuw's Resp. 1 ¶¶ 3, 4 (undisputed).)

Several of the individuals answered in the affirmative that they were just at Tank Beach. (Second

Decl. Cabrera 3 ¶ 23; *compare* Cabrera's Undisputed Facts 7 ¶ 5, *with* Yarofalchuw's Resp. 1 ¶ 5

(undisputed as to location but not as to probable cause).) Sgt. Cabrera then "asked if one of them

was 'Nick,'" to which Yarofalchuw identified himself. (Decl. Cabrera 3 ¶ 29.)

      The conversation between Sgt. Cabrera and Yarofalchuw was initially cordial. (*See* Decl.

Topulei 2 ¶ 8 ("When [Cabrera] arrived at [Yarofalchuw's] house, he was very nice and attempted

to advise Nick how to address his issues with Fish and Wildlife.").) Yarofalchuw then "admitted

to confronting a DFW employee at Tank Beach less than a half hour before [Cabrera] arrived at

the residence." (Second Decl. Cabrera 3 ¶ 26.) However, after being questioned, Yarofalchuw

insisted that Sgt. Cabrera leave his property. (*Compare* Yarofalchuw's Undisputed Facts 2 ¶ 7 *with*

Cabrera's Resp. 2 ¶ 7 (undisputed as to instructions to depart).) It was at this point that Sgt. Cabrera

exited the driveway and parked outside the hedge by the front of the driveway. (*Compare* Cabrera's

Undisputed Facts 7 ¶ 8, *with* Yarofalchuw's Resp. 2 ¶ 8 (undisputed).)

      According to Sgt. Cabrera, he backed out of the driveway and along Niyoron Street but

"did not block the driveway." (Decl. Topulei 2 ¶ 11; Second Decl. Cabrera 4 ¶ 37 ("I did not block

the driveway and I had no intention to block or partially block the driveway.").) Yarofalchuw

provided a photographic rendition of the location of Sgt. Cabrera's vehicle which depicts Sgt.

Cabrera's vehicle as parked outside the hedge of Yarofalchuw's driveway without obstructing it.

(ECF No. 38-1; *see* Third Decl. Yarofalchuw 1 ¶ 2, ECF No. 38 (describing that the position of

the black pickup as Cabrera's patrol vehicle).) Nevertheless, Yarofalchuw maintains that Sgt.

Cabrera did in fact block the driveway by parking the patrol car "in the grassy area along the

roadside, outside the hedge but immediately adjacent to it, partly blocking egress from

[Yarofalchuw's] driveway into the road." (Yarofalchuw's Undisputed Facts 3 ¶ 8, ECF No. 44 (referencing two photographs at ECF Nos. 38-1 and 38-2).)

After he parked his police vehicle in the grassy area, Sgt. Cabrera got out of his vehicle and approached Yarofalchuw's three guests; he asked them to stay back so that he could get their identification information, to which they agreed. (Decl. Topulei 2 ¶¶ 13-14; *compare* Cabrera's Undisputed Facts 7, ¶ 12, *with* Yarofalchuw Resp. 3 ¶ 12 (undisputed).) Yarofalchuw came out of his house and saw that Sgt. Cabrera was standing in the driveway speaking with the three individuals. (Third Decl. Yarofalchuw 1 ¶ 3; *cf.* Second Decl. Cabrera 4 ¶ 43 ("I then rushed back to my vehicle, and about the same time Mr. Yarofalchuw came out of his house.").) Yarofalchuw avers that as his three guests were leaving, Sgt. Cabrera told them he intended to arrest Yarofalchuw. (Yarofalchuw's Undisputed Facts 3-4 ¶ 8 (first citing Decl. Salapwa ¶ 4, ECF No. 23 ("The policeman spoke to us, saying, 'I am (or maybe we are) going to arrest your cousin.'"); and then citing Decl. Ratauyal ¶ 4, ECF No. 24 (same)).)

Yarofalchuw approached Sgt. Cabrera while holding up something in his hand. (Second Decl. Cabrera 4 ¶¶ 45, 46; Cabrera's Undisputed Facts 8 ¶ 15, *with* Yarofalchuw's Resp. 3 ¶ 15 (undisputed except as to Yarofalchuw approaching aggressively).) Six minutes after his initial arrival at 5:49 p.m., Sgt. Cabrera radioed in to DPS Central about Yarofalchuw's "belligerent behavior which allowed other officers to hear the yelling in the background." (Decl. Sablan 2 ¶¶ 12, 14.) Officer Fitial heard Yarofalchuw over the radio, prompting Officer Fitial to return to Yarofalchuw's residence for a second time. (*Compare* Fitial's Undisputed Facts 4 ¶ 7, *with* Yarofalchuw's Resp. 4 ¶ 7 (undisputed except as to Yarofalchuw yelling profanities).) Officer Fitial arrived on scene where he allegedly at least partially blocked the driveway. (Decl. Topulei 2 ¶ 16; *see* Third Decl. Yarofalchuw 1 ¶ 2 (describing the position of Fitial's vehicle as where the white sedan in Ex. 1 (ECF No. 38-1) is located); *see also* Second Decl. Cabrera 4 ¶ 44 ("Officer

Fitial returned to the residence, and he parked behind my vehicle facing the same direction on the left side of driveway and may have blocked the driveway[.]").)[3] Allegedly, the position of Officer Fitial's vehicle made it so that the three guests could not leave. (*See* Decl. Ratauyal ¶ 4 ("Just then the second police car came back and parked behind [Cabrera's car], blocking the driveway, so then we could not leave.").

Upon arrival, Officer Fitial observed Yarofalchuw approach Sgt. Cabrera holding a phone possibly to record Sgt. Cabrera. (*Compare* Cabrera's Undisputed Facts 8 ¶ 16 with Yarofalchuw's response 3 ¶ 16 (undisputed).) Yarofalchuw cites to two photos depicting his position when he was arrested (ECF Nos 38-4 and 38-5), which both show that he was at the entrance of his driveway. (*See* Yarofalchuw's Undisputed Facts ¶ 16.) Although both Defendants dispute Yarofalchuw's claim "subject to clarification (*see* Cabrera's Resp. ¶ 16; Fitial's Resp. ¶ 16), both assert in their declarations that Yarofalchuw was outside his property when confronting Sgt. Cabrera (*see* Decl. Cabrera ¶ 48, ECF No. 20-2; Fitial Decl. ¶ 21, ECF No. 20-3). Sgt. Cabrera then instructed Fitial to arrest Yarofalchuw for disturbing the peace. (*Compare* Fitial's Undisputed Facts 5 ¶ 14, *with* Yarofalchuw's Resp. 5 ¶ 14 (undisputed).) Yarofalchuw was arrested at 6:02 p.m., less than 30 minutes after DPS Central received the 911 call from Mr. Roberto and less than 15 minutes after Sgt. Cabrera first arrived at Yarofalchuw's residence. (*See* Decl. Sablan 2 ¶¶ 9, 12, 16.)

## II.  PROCEDURAL BACKGROUND

Yarofalchuw initiated this § 1983 action alleging a seizure in contravention of the Fourth Amendment to the United States Constitution on January 3, 2022. (Compl.) Defendants Sgt. Cabrera and Officer Fitial each filed an answer (Answer, ECF Nos. 8 (Cabrera); 9 (Fitial)) supported by a number of attachments (ECF Nos. 8-1, 9-1 (police report); 8-2, 9-2 (investigative

---

[3] Fitial does not admit or deny whether he partial blocked the driveway in response to Yarofalchuw's undisputed facts. (*Compare* Yarofalchuw's Undisputed Facts 5 ¶ 12 *with* Fitial's Resp. 2 ¶ 12.)

report); 8-3, 9-3 (police call log sheet)). Yarofalchuw subsequently moved for summary judgment (ECF No. 15) and filed numerous supporting documents including his own declaration (ECF No. 16) and photos in support of his factual allegations (ECF Nos. 16-1–16-3). Yarofalchuw replied (ECF No. 21) with additional declarations (ECF Nos. 22-25).

Defendants cross-moved for summary judgment themselves (ECF Nos. 20, 20-1) attaching numerous declarations (ECF Nos. 20-2 (Cabrera); 20-3 (Fitial); 20-4 (Roberto); 20-5 (Alepuyo)) and a map depicting their factual representations (ECF No. 20-5).

On September 1, 2022, the Court held a hearing on the parties' motions (Mins., ECF No. 28), and found that an unlawful seizure had occurred prior to the physical arrest. Specifically, when Defendant Sgt. Cabrera failed to leave the scene by parking outside the premises and obstructing the driveway, he unlawfully seized Yarofalchuw by demonstrating his show of authority. The Court relied on the map depictions by Defendants and reasoned that while Yarofalchuw was free to enter his home, he was not free to leave, and both Sgt. Cabrera and later Fitial impeded his movements. Therefore, by wholly obstructing Yarofalchuw's driveway the Court found that Defendant Sgt. Cabrera's conduct constituted an unconstitutional seizure as clearly established by law.

The Court initially applied its ruling to Defendant Fitial, too; however, after hearing arguments from Fitial's counsel regarding qualified immunity, the Court denied Yarofalchuw's MSJ as to Fitial and granted Fitial's Cross MSJ based on qualified immunity. (*Id.*) In particular, the Court found that because the seizure occurred prior to Defendant Fitial's second arrival on the scene, Fitial could not have been aware of the initial seizure. This mistake of fact therefore warranted a finding of qualified immunity as to Fitial only.

Nevertheless, the Court permitted Sgt. Cabrera to file supplemental briefing on the issue of qualified immunity as applied to him, and another subsequent hearing was scheduled.[4] (*Id.*) During this time, Yarofalchuw also moved for reconsideration as to the Court's finding of qualified immunity as applied to Fitial.[5]

At the subsequent hearing on October 17, 2022 (Mins., ECF No. 43), the Court pressed Yarofalchuw as to whether Sgt. Cabrera's conduct that allegedly constituted an unlawful seizure was clearly established at the time of its occurrence. Yarofalchuw responded that Sgt. Cabrera's conduct constituted a show of authority such that Yarofalchuw was not free to leave, as is clearly established by case law. Sgt. Cabrera, by contrast, continued to argue there was no seizure and that Yarofalchuw had exposed himself to the public's eye having approached Sgt. Cabrera at the driveway entrance. Therefore, he argued, there was no seizure within the home or curtilage, there was probable cause for Yarofalchuw's arrest, and there was no constitutional violation. The Court took the matter under advisement. (*Id.*)

At the December 1, 2022 status conference, the Court rendered its findings in favor of Defendants, as detailed below. (Mins., ECF No. 48.)

### III. LEGAL STANDARD

#### A. Summary Judgment

The Court shall grant summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[4] These filings include the supplemental briefs and related attachments which include declarations (see ECF Nos. 31 (Cabrera's supplemental brief); 31-1 through 31-5 (declarations); 35 (Yarofalchuw's supplemental brief); 36 (Cabrera's reply); 36-1 (declaration)).

[5] The briefing includes Yarofalchuw's motion for reconsideration, relevant declarations and supporting documents, and Fitial's opposition. (ECF Nos. 37 (Yarofalchuw's motion for reconsideration); 38 (declaration) 38-1 through 38-6 (photos and other supporting documents); 40 (declaration); 42 (Fitial's opposition)).

Civ. P. 56(a). "[W]hen parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citation omitted). The court must consider the evidence proffered by both sets of motions before ruling on either one. *Id*. "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2001) (citation omitted).

"As a general matter, where the party moving for summary judgment would bear the burden of proof at trial, that moving party bears the initial burden of proof at summary judgment as to each material fact to be established in the complaint and must show that no reasonable jury could find other than for the moving party." *Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (citing *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003)). "Where the moving party would not bear the burden at trial, the motion need only specify the basis for summary judgment and identify those portions of the record, if any, which it believes demonstrate the absence of a genuine issue of material fact on some essential elements of the claims." *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**B.  Reconsideration**

Pursuant to Rule 59(e), a party may move to alter or amend a judgment within twenty-eight days after entry of the challenged judgment. *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (citing Fed. R. Civ. P. 59(e)). District courts have "considerable discretion" when ruling on a motion under Rule 59(e). *See Teamsters Local 617 Pension and Welfare Funds v. Apollo*

1   *Grp., Inc.*, 282 F.R.D. 216, 220 (D. Ariz. 2012) (citation omitted). Nonetheless, relief pursuant to

2   Rule 59(e) is granted only in highly unusual circumstances, such as (1) a court's manifest error of

3   law or fact; (2) "newly discovered or previously unavailable evidence"; (3) a manifestly unjust

4   decision; or (4) "an intervening change in the controlling law." *Turner v. Burlington N. Santa Fe.*

5   *R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (citations omitted).

6

7   **IV. DISCUSSION**

8        The Fourth Amendment to the United States Constitution protects "[t]he right of the people

9   to be secure in their persons, houses, papers, and effects, against unreasonable searches and

10  seizures[.]" Searches and seizures inside a home or in the curtilage of a home without a warrant

11  are presumptively unreasonable. *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012)

12  (first quoting *Payton v. New York*, 445 U.S. 573, 586 (1980) (inside a home); and then citing *Oliver*

13  *v. United States*, 466 U.S. 170, 180 (1984) (curtilage)). However, "[q]ualified immunity is a

14  defense to lawsuits against government official arising out of the performance of their duties."

15  *Kraus v. Pierce County*, 793 F.2d 1105, 1108 (9th Cir. 1986). "Its purpose is to permit such

16  officials conscientiously to undertake their responsibilities without fear that they will be held liable

17  in damages for actions that appear reasonable at the time, but are later held to violate statutory or

18  constitutional rights." *Id.* (first citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982); and then

19  citing *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). Officers may not avail of the qualified immunity

20  defense if there has been a violation of a constitutional right and if the right at issue was "clearly

21  established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223,

22  232 (2009). "Qualified immunity balances two important interests—the need to hold public

23  officials accountable when they exercise power irresponsibly and the need to shield officials from

24  harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231.

25

26

27

28

The parties' arguments boil down to two questions: (1) whether there is no genuine dispute of material fact that an unlawful seizure occurred in violation of the Fourth Amendment, and (2) whether either or both Defendant Sgt. Cabrera and Officer Fitial are entitled to qualified immunity. The Court reconsiders its original rulings and instead finds that there was not an unlawful seizure because neither Sgt. Cabrera nor Fitial displayed a show of authority such that Yarofalchuw's movements were restrained within the home or curtilage. Furthermore, even if the Court were to adopt Yarofalchuw's factual representations, there is no robust consensus of caselaw to put Sgt. Cabrera and Fitial on notice that their conduct was clearly established to constitute an unconstitutional seizure.

## A.  Violation of Constitutional Right—Seizure

Yarofalchuw asserts that qualified immunity does not apply because it is clearly established that (1) a warrantless arrest in the home is per se unreasonable absent exigent circumstances, (2) the location of the arrested person, not the arresting officers, determines whether an arrest occurs within the home or curtilage, and (3) "an arrest is effected by a show of authority indicating to a reasonable person that he is not free to terminate his encounter with police and go about his business, and that such a show of authority can include blocking the suspect's egress, such as his driveway." (Pl. Suppl. Br. 2-3, ECF No. 35.) On the third point, Yarofalchuw argues that Sgt. Cabrera showed his authority when he parked outside the driveway, at least partially obstructing it, stood next to his vehicle, and instructed the three other individuals, who were still within the curtilage of the home, to remain on the premises. (*Id.* at 5.) "His call for backup, which resulted in the speedy return of Officer Fitial, was also part and parcel of this show of authority." (*Id.*) Thus, Yarofalchuw concludes, Sgt. Cabrera's conduct and continued investigation led to an unlawful seizure within Yarofalchuw's home and curtilage.

A person is seized if "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citation omitted). In other words, "[a] seizure occurs only when a reasonable person would believe that he was not free to go based on police conduct." *United States v. Brown*, 828 F. App'x 366, 369 (9th Cir. 2020) (unpublished) (citing *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007)). This usually happens when law enforcement uses "physical force or show of authority[.]" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations omitted). There must be "actual submission" such that there is an "unambiguous intent to restrain[.]" *Id*. at 254-55 (citations omitted). Circumstances to consider include: the threatening presence of multiple officers, an officer's display of a weapon, physical touching, or "the use of language or tone of voice to indicate that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (citations omitted).

At the initial motions hearing on September 1, 2022, the Court originally agreed with Yarofalchuw that there was an unconstitutional seizure by Sgt. Cabrera. The facts begin with Sgt. Cabrera responding to a disturbance at Tank Beach, and upon finding Yarofalchuw at his home, engaging in a consensual and cordial conversation. (*See* Decl. Topulei 2 ¶ 8.) Once Yarofalchuw terminated that consensual interaction, Sgt. Cabrera proceeded to leave Yarofalchuw's curtilage and park outside the entrance of his home. (*See* Second Decl. Cabrera 3 ¶¶ 27-29; *compare* Cabrera's Undisputed Facts 7 ¶ 8, *with* Yarofalchuw's Resp. 2 ¶ 8 (undisputed).) Up until this point, no seizure had occurred.[6] However, relying on Defendants' own photo rendition of the

---

[6] At the hearings, Yarofalchuw suggested that Sgt. Cabrera *intended* to show his authority as he was backing out of Yarofalchuw's home and then parking outside the curtilage. However, because Cabrera's state of mind at the time cannot readily be ascertained by the evidence submitted, the Court rejects any argument as to whether backing out of the driveway might reflect Sgt. Cabrera's intent or plan.

location of their patrol vehicles (*see* ECF No. 20-5 at 4 (Ex. 7.B)), the Court found that there was no genuine dispute of material fact that Sgt. Cabrera's police vehicle, with Fitial's vehicle parked to the rear of Sgt. Cabrera's, completely obstructed the entrance of Yarofalchuw's driveway. *Cf. Brown*, 828 F. App'x at 369 ("[T]he officers pulled up behind Wilson's SUV, did not block it, and simply walked up to the SUV to speak with the occupants. There was no seizure for Fourth Amendment purposes."). On this basis, the Court determined that the conduct by Sgt. Cabrera depicted a show of authority such that Yarofalchuw's movements were constrained, and an unlawful seizure had occurred within his home and curtilage and prior to Yarofalchuw's physical arrest. *See Brendlin*, 551 U.S. at 254 (describing an unlawful seizure as restraining one's freedom of movement (citations omitted)).

However, upon further briefing and argument, the Court now reconsiders its initial determinations and finds that Sgt. Cabrera did not demonstrate a show of authority leading to an unlawful seizure.

First, Yarofalchuw cannot conclude that there was a threatening police presence. At the outset, the conversation was cordial without any allegation of a threatening tone or command. Sgt. Cabrera acquiesced in leaving Yarofalchuw's curtilage, parked outside Yarofalchuw's driveway, got down on foot, and walked towards the three male guests to gather their identification information. (Decl. Topulei 2 ¶¶ 13-14; *compare* Cabrera's Undisputed Facts 7, ¶ 12, *with* Yarofalchuw Resp. 3 ¶ 12 (undisputed).) Sgt. Cabrera was the lone officer on the scene, outnumbered four-to-one and was still outnumbered when Fitial arrived. Despite this and the report that Yarofalchuw threatened to shoot the DFW employee responsible for the drone allegedly flying over his house, Sgt. Cabrera never patted down any of the individuals. Sgt. Cabrera did not brandish his weapon or conduct himself in a threatening manner towards Yarofalchuw or the three

male individuals. Taking in the totality of the circumstances, Sgt. Cabrera's presence was not a "threat," such that would support a show of authority.

That said, two of Yarofalchuw's three guests indicated that Sgt. Cabrera stated his intent to arrest Yarofalchuw. (Yarofalchuw's Undisputed Facts 3-4 ¶ 8 (first citing Decl. Salapwa 1-2 ¶ 4 ("The policeman spoking to us, saying, 'I am (or maybe we are) going to arrest your cousin.'"); and then citing Decl. Ratauyal 1 ¶ 4 (same).) But this comment was communicated to the three individuals, *not* to Yarofalchuw. As far as Yarofalchuw was concerned, he had no idea that Sgt. Cabrera had any intent to arrest him. Furthermore, these alleged statements made by Sgt. Cabrera are at odds with the third guests' rendition of the facts which omit any suggestion that Sgt. Cabrera made any kind of threat. (*See* Decl. Topulei ¶¶ 13-14 (describing that Sgt. Cabrera requested contact information).) At a minimum, there is a dispute of fact as to whether Sgt. Cabrera informed all three guests that he intended to arrest Yarofalchuw, but this dispute is not as to a material fact. It would be material had Yarofalchuw known about Sgt. Cabrera's alleged statement to arrest him. Therefore, the facts in this case lead the Court to conclude there was no show of authority.

As for the alleged obstruction of Yarofalchuw's entryway, Yarofalchuw's *own depiction* of the position of Sgt. Cabrera's vehicle shows that Sgt. Cabrera did *not* obstruct the driveway entrance. (*See* Ex. 1, ECF No. 38-1 (representing Sgt. Cabrera's patrol vehicle as the black truck off to the side of the driveway entrance).)[7] This depiction alone warrants reconsideration of the Court's original findings. But even without the benefit of Yarofalchuw's own depiction, Yarofalchuw was free to move about and even felt free to approach Sgt. Cabrera himself. This strongly indicates that Yarofalchuw did not feel threatened or subservient.

---

[7] The Court did not originally benefit from having this depiction as Yarofalchuw submitted this exhibit after the first set of briefing and the first hearing on the MSJ.

14

1    Officer Fitial's arrival and conduct does not alter the Court's disposition. Critically, by the

2    time Fitial returned, Yarofalchuw was approaching Sgt. Cabrera at the driveway entrance of his

3    curtilage. (*Compare* Yarofalchuw's Undisputed Facts 6 ¶ 15 *with* Fitial's Resp. 3 ¶ 15 (undisputed

4    as to approach).) Within minutes, Sgt. Cabrera instructed Fitial to physically arrest Yarofalchuw.

5    However, as represented by Yarofalchuw himself—he was at the entrance of his driveway and

6    curtilage. Specifically, Yarofalchuw cites to two photos depicting his position when he was

7    arrested (ECF Nos 38-4 and 38-5), which both show that he was at the front of his driveway. (*See*

8    Yarofalchuw's Undisputed Facts ¶ 16.) Although Defendants' dispute Yarofalchuw's claim

9    "subject to clarification" (*see* Cabrera's Resp. ¶ 16; Fitial's Resp. ¶ 16), both assert in their

10   declarations that Yarofalchuw was outside his property when confronting Sgt. Cabrera (*see* Decl.

11   Cabrera ¶ 48, ECF No. 20-2; Fitial Decl. ¶ 21, ECF No. 20-3). Based on the photo renditions

12   provided by Yarofalchuw, he had no expectation of privacy when he effectively stood at the

13   "doorway" because he "was exposed to public view, speech, hearing, and touch as if [he] had been

14   standing completely outside [his] house." *United States v. Santana*, 427 U.S. 38, 42 (1976). In

15   other words "one step forward would have put [him] outside, one step backward would have put

16   [him] in the vestibule of [his] residence." *Id*. at 40 n.1. Given these facts based on Defendants'

17   declarations and Yarofalchuw's depictions, the Court finds there was no "show of authority" that

18   occurred within the curtilage of his home. Any "show of authority" by Fitial essentially occurred

19   outside the home—in fact right by the road—and requiring no exigent circumstances but probable

20   cause, which Yarofalchuw does not challenge.

21   Taken in its totality, in the approximate fifteen minutes between Sgt. Cabrera's initial

22   arrival at Yarofalchuw's residence and Yarofalchuw's arrest (*see* Decl. Sablan ¶¶ 12, 16), there

23   was no such show of authority that led to an unlawful seizure. Sgt. Cabrera's actual conduct was

24   not authoritative, and Officer Fitial's behavior did not depict a show of authority while

Yarofalchuw was within the curtilage of his home. Based on the facts as analyzed above, the Court reconsiders its September 1, 2022 ruling pursuant to Rule 59(e) and finds that there was no unlawful seizure within the home or curtilage before being physically arrested. Defendant Sgt. Cabrera's motion for reconsideration is therefore granted. (ECF No. 36).

**B. Qualified Immunity—Clearly Established Law**

Even if the Court were to find that there was an unconstitutional seizure, Yarofalchuw has failed to identify a robust consensus of caselaw to suggest that Sgt. Cabrera and Fitial's allegedly unconstitutional conduct was clearly established. Officers are entitled to qualified immunity unless (1) they "violate[] a federal statutory or constitutional right[,]" and (2) the unlawfulness of their conduct was "clearly established at the time[.]" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation omitted). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id*. (citation omitted). The standard is demanding as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "The plaintiff bears the burden of demonstrating that the right at issue was clearly established." *Kramer v. Cullinan*, 878 F.3d 1156, 1164 (9th Cir. 2018) (citation omitted).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' which means it is dictated by 'controlling authority' or a 'robust "consensus of cases of persuasive authority."'" *Wesby*, 138 S. Ct. at 589-90 (citations omitted). The contours of the clearly established rule "must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id*. at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). It must be examined "in light of the

specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citation omitted). In other words, it "requires a high 'degree of specificity[,]'" *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)), examined in a more "particularized" and "relevant" sense, *Brosseau*, 543 U.S. at 199-200 ("The parties point us to only a handful of cases relevant to the 'situation [Brosseau] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."). "Of course, in an obvious case . . . even without a body of relevant case law" the conduct at issue may be clearly established. *Id*. at 199 (citations omitted). While a specific case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted).

In this case, the pertinent inquiry is whether it is clearly established that an officer leaving the curtilage of the home but continuing the investigation with other individuals within or near the curtilage and partially obstructing a driveway constitutes a show of authority such that there is an unconstitutional seizure. Yarofalchuw has failed to cite to any authority to establish as much. In fact, during the October 17, 2022 hearing, the Court continuously pressed Yarofalchuw to describe with particularity the caselaw that supports Yarofalchuw's position that the law is clearly established in his favor. Yarofalchuw responded referencing footnote six of his supplemental brief which cites to seven cases. (*See* Pl. Suppl. Br. 4 n.6, ECF No. 35.) The Court distinguishes them below.

The facts in *Washington* are most analogous to the facts in this case but are nevertheless distinct. 490 F.3d at 767. There, two officers—Shaw and Pahlke—investigated Washington who "was seated in his lawfully parked car[.]" *Id*. Initially, no seizure occurred when Officer Shaw:

> parked his squad car a full length behind Washington's car so he did not block it.
> Shaw did not activate his sirens or lights. Shaw approached Washington's car on

> foot, and did not brandish his flashlight as a weapon, but rather used it to illuminate the interior of Washington's car. Although Shaw was uniformed, with his baton and firearm visible, Shaw did not touch either weapon during his encounter with Washington. Shaw's initial questioning of Washington was brief and consensual, and the district court found that Shaw was cordial and courteous. Under these circumstances, the district court correctly concluded that a reasonable person would have felt free to terminate the encounter and leave.

*Id.* at 770. However, as the circumstances evolved, so did the scope of the search. *See id.* at 772. Although Washington consented to being searched outside his vehicle, the way the officer searched him "was authoritative and implied that Washington 'was not free to decline his requests.'" *Id*. at 771-72 (first quoting *Orhorhaghe v. INS*, 38 F.3d 488, 495 (9th Cir. 1994); and then citing *United States v. Patino*, 649 F.2d 724, 727 (9th Cir.1981), *abrogation on other grounds recognized by United States v. $25,000 U.S. Currency*, 853 F.2d 1501, 1505 n.2 (9th Cir.1988)). To conduct the search, the officers directed Washington, who had his hands raised, away from his personal vehicle and towards the squad car. *Id*. The search of Washington's person itself exceeded the usual pat-down for weapons. *See id*. And, Officer Pahlke

> positioned himself between Washington [who was being searched at the squad car] and [Washington's] personal car. If Washington wanted to end his encounter with [the officers] and leave, he would have had to either: (a) leave on foot, abandoning his unlocked car, with the driver's door partially open; or (b) navigate through or around [Officer Pahlke] to get back into his car.

*Id*. at 773. The court determined that "[n]either option was realistic, especially considering [the officers] outnumbered and outsized Washington." *Id*. (citation omitted). In concluding that an unconstitutional seizure occurred, the *Washington* court described:

> In sum, under the totality of the circumstances—Shaw's authoritative manner and direction of Washington away from Washington's car to another location . . . that [the officers] outnumbered Washington two to one, the time of night and lighting in the area, that [the officer] was blocking Washington's entrance back into his car, and that neither [officer] informed Washington he could terminate the encounter and leave—we conclude that a reasonable person would not have felt free to disregard [the officer's] directions, end the encounter with [the officers], and leave the scene.

*Id*. at 773-74.

Although *Washington* contains facts most analogous to this case, it is nonetheless distinguishable. In this case, the question is whether there was a show of authority such that Yarofalchuw was unconstitutionally seized before any actual arrest. Unlike in *Washington*, Sgt. Cabrera did not direct Yarofalchuw to a specific location let alone away from the safety of his home—in fact, Sgt. Cabrera did not instruct Yarofalchuw to do anything. Furthermore, despite having been approached by Yarofalchuw, and despite knowing about the allegations of earlier threats by Yarofalchuw to Mr. Roberto, Sgt. Cabrera did not pat him down. While Yarofalchuw maintains Sgt. Cabrera and Officer Fitial blocked the entryway to his house, Yarofalchuw freely moved about and did not seem threatened by the presence of the two officers. Additionally, it was Sgt. Cabrera who was outnumbered four-to-one when Sgt. Cabrera first arrived at the residence (and then four-to-two when Fitial arrived). Yarofalchuw further argues he was seized immediately after Sgt. Cabrera parked his police vehicle outside his curtilage rather than completely leaving the premises. But when Sgt. Cabrera stepped out of his vehicle and walked back into Yarofalchuw's driveway, it was not to approach Yarofalchuw, but to briefly speak to his guests. Sgt. Cabrera never addressed Yarofalchuw again inside the curtilage of his home. It was not until after Yarofalchuw left the pavilion, went into his house, came out of his house, and walked straight to Sgt. Cabrera did the two come into contact again. While seemingly analogous, the totality of the facts reveals that there are many more distinctions than there are similarities and *Washington* cannot be used to demonstrate that Sgt. Cabrera or Fitial's conduct was clearly established as being unconstitutional.

Yarofalchuw's reliance on *United States v. Alvarado*, 763 F. App'x 609 (9th Cir. 2019) (unpublished), is also misplaced. In that case, Alvarado moved to suppress the firearm found in his vehicle because he alleged "the police initiated an investigatory stop without reasonable suspicion[.]" *Id*. at 610. The Ninth Circuit agreed with the district court in finding that the two

officers conducting the investigatory stop seized Alvarado when the officers "simultaneously parked their marked patrol cars perpendicular to [Alvarado's vehicle which he was occupying] and shone their spotlights into the car." *Id*. (citing *Washington*, 490 F.3d at 769-70). The position of the patrol cars combined with the use of spotlights affected Alvarado's vision and "likely restricted [his] ability to leave." *Id*. (citing *Washington*, 490 F.3d at 773). Additionally, "[t]he encounter took place late at night in an isolated residential setting, and neither officer informed Alvarado of his right to terminate the encounter." *Id*. at 611. Nevertheless, the court found reasonable suspicion for Alvarado's arrest.

Like *Alvarado*, Yarofalchuw contends that the obstruction of his path and failure to terminate the encounter constituted a seizure. However, the totality of the circumstances is critical to the seizure analysis, and here, the totality of the circumstances reveals a very different set of facts than that in *Alvarado*. In that case, Alvarado was occupying a vehicle which was aggressively blocked by the patrol cars with spotlights directly pointed at Alvarado's vehicle. The situation occurred late at night in an isolated residential setting. Here, as the Court previously described, Yarofalchuw's own depiction shows that Sgt. Cabrera did not obstruct Yarofalchuw's pathway. But even if the Court were to assume that Fitial obstructed the entryway, this did not occur until after Yarofalchuw had approached Sgt. Cabrera and escalated the situation. Unlike in *Alvarado*, where Alvarado was constrained from movement away from his vehicle, Yarofalchuw felt free to move and confront Sgt. Cabrera. Apart from the alleged obstruction by the vehicle, no other set of facts tend to show that Sgt. Cabrera asserted such a show of authority that this Court should find *Alvarado* analogous.

*Jacobo-Esquivel v. Hooker*, No. CV-14-01781, 2016 WL 524655 (D. Ariz. Feb. 10, 2016), is also inapt. In *Hooker*, two police officers—Hooker and Jones—sought to investigate a vehicle parked at a house believed to be a drug stash house. *Id*. at *1. Mid-morning, Jacobo-Esquivel exited

the alleged drug stash house and headed toward a Jeep parked in the driveway. *Id*. "Officer Hooker drove the patrol car to the residence. The parties dispute whether Officer Hooker parked directly behind the Jeep so as to block the driveway. Officer Jones exited the patrol car and approached the driver's side of the Jeep." *Id*. (citation omitted). According to the plaintiffs, upon trying to step outside the Jeep, Officer Jones ordered Jacobo-Esquivel to remain in the vehicle and demanded identification from him and his companion in the passenger seat. *Id*. at *2. After taking their identification cards, Jacobo-Esquivel consented to getting out of the jeep at which point, "Officer Jones immediately frisked him and handcuffed him." *Id*. In its *Terry* analysis,[8] the district court determined that "[w]hether the driveway was blocked is *only one factor* in the totality of the circumstances analysis for determining whether the officers' initial approach constituted a stop." *Id*. at *6 (emphasis added). The court ultimately concluded that whether the officers blocked the driveway was a genuine dispute of material fact that could not be determined on a summary judgment motion. *Id*. In its qualified immunity analysis, the court noted that if the disputed fact "that the officers blocked the driveway with their patrol car—were resolved in Jacobo-Esquivel's favor, that fact *in combination with the other circumstances in this case* would conclusively determine that Defendant[] [officers] do not enjoy qualified immunity." *Id*. (citing *Washington*, 490 F.3d at 773).[9]

Here, even if the Court assumes Sgt. Cabrera and/or Fitial blocked Yarofalchuw's driveway, that fact in combination with the other circumstances in this case would *not* conclusively

---

[8] "A *Terry* stop generally consists of, at most, a brief stop, interrogation and under proper circumstances, a brief check for weapons. If the *Terry* stop exceeds this limited intrusion, it has become a de facto arrest, requiring probable cause." *United States v. Kinsey*, 952 F. Supp. 2d 970, 973 (E.D. Wash. 2013) (internal quotation marks and citations omitted).

[9] The District Court of Arizona cites to *Washington* for the proposition that blocking an individual's path in any way is a consideration of probably decisive significance in finding a seizure. *Hooker*, 2016 WL 524655, at *6. In reviewing *Washington*, that statement was derived from a parenthetical out of a 1982 Fifth Circuit decision. *Washington*, 490 F.3d at 773 (citing *United States v. Berry*, 670 F.2d 583, 597 (5th Cir.1982)). This Court notes this attribution but nevertheless agrees that obstructing a pathway is a critical component in the seizure analysis.

determine that Sgt. Cabrera and Fitial are barred from qualified immunity. As iterated previously, neither Sgt. Cabrera nor Fitial demonstrated such a show of authority that Yarofalchuw can claim he was unconstitutionally seized within his home and/or curtilage. Rather, as previously established, the Court finds that Fitial was responding swiftly and reasonably to a situation that Yarofalchuw himself escalated and Sgt. Cabrera's conduct did not rise to the level of authoritative. Instead, Yarofalchuw's behavior (moving freely within his home and curtilage, confronting Sgt. Cabrera, recording the situation) suggests that he did not feel threatened by or submissive to the officers.

The circumstances in *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994) are also not present here. In that case, a team of four agents including two investigators from the United States Immigration and Naturalization Service ("INS"), one police officer, and an investigative banker, sought to investigate a Nigerian national, Orhorhaghe, for an alleged credit card scheme. *Id*. at 491. In finding an unconstitutional seizure, the Ninth Circuit determined that Orhorhaghe was faced with "the threatening presence of several officers . . . [even though] he reasonably expected to meet a *single* bank investigator" to discuss the alleged scheme in his apartment building. *Id*. at 494 (emphasis added) (citation omitted). "For all Orhorhaghe knew, all four people in the hallway were armed and in league with the INS agents. (In fact, three of them were armed law enforcement personnel.)" *Id*. At least one agent "made it clear to Orhorhaghe by his actions that he was carrying a weapon," with the record reflecting that the agent "*did* reveal his weapon to Orhorhaghe" by "put[ting] his hands on his hip 'in such a way as to reveal that he was carrying a gun on his right hip.'" *Id*. at 495. Additionally, "the nonpublic setting substantially increased the coercive nature of the encounter[.]" *Id*. "[T]he fact that a confrontation between law enforcement officers and an individual takes place in a private place does not in itself transform that encounter into a 'seizure.'" *Id*. But, in the case of Orhorhaghe, the confrontation "took place in the hallway of his apartment

building—private property shielded from the view of the vast majority of the public." *Id*. And, finally, the INS agent "acted in an officious and authoritative manner that indicated that Orhorhaghe was not free to decline [the agent's] requests." *Id*.

Here, Yarofalchuw was not confronted with four agents, but one (Sgt. Cabrera), with Fitial only returning after Yarofalchuw escalated the situation. While Yarofalchuw may have assumed Sgt. Cabrera had a weapon on him as an on-duty officer, there are no facts to suggest that Sgt. Cabrera brandished his weapon or flaunted it in a threatening manner. Significantly, Sgt. Cabrera had already retreated from Yarofalchuw when he reversed his police vehicle, and when he approached Yarofalchuw's guests to get their contact information. In contrast to the four agents' presence inside the building, it was Yarofalchuw who approached Sgt. Cabrera at the driveway entrance, far away from the doorsteps to his actual home, and on the edge of the curtilage exposed to public view. Finally, Sgt. Cabrera did not act authoritatively towards Yarofalchuw. In fact, it was Yarofalchuw who approached Sgt. Cabrera. Therefore, based on the facts of this case, *Orhorhaghe* does not support a finding of clearly established law.

As discussed below, the remaining cases that Yarofalchuw rely on also do not clearly establish that Sgt. Cabrera or Officer Fitial's conduct was in contravention of the Fourth Amendment. Those cases are inapplicable to the facts here, and therefore do not constitute the robust consensus of caselaw that would support Yarofalchuw's position.

In *United States v. Brown*, Brown sought to suppress evidence of heroine because "his encounter with two police officers in a motel parking lot did not comply with" *Terry* requirements. 996 F.3d 998, 1001 (9th Cir. 2021). Two law enforcement officers approached Brown and another individual after receiving a radio call about two transients loitering in a motel parking lot, with one of them having urinated in the bushes. *Id*. at 1002. After seven minutes of conversation (including routine and generic questions such as inquiring on date of birth, height, and weight), the officer's

suspicions of drug dealing prompted him to order Brown to stand up and turn around. *Id*. at 1003.

Brown complied, and the officer reaching into Brown's pocket, pulled out a plastic bag containing

heroine and finding several thousand dollars, "unused syringes, and suboxone strips used to treat

opioid withdrawal." *Id*. Brown was charged with possession of heroine with intent to distribute.

*Id*. at 1004.

He subsequently moved to suppress the items based on an allegedly unconstitutional

seizure. *Id*. The Ninth Circuit described that the initial approach was consensual and

nonthreatening, with generic questions from the officer to Brown. *Id*. at 1005. The officer "never

suggested that Brown was not free to decline to answer or to ignore the officer." *Id*. "Indeed, during

the encounter Brown felt free to take a personal phone call, during which he was chatting and

laughing, for nearly a full minute." *Id*. at 1006. However, "the nature of the encounter changed

once [the officer] ordered Brown to stand up and turn around. By giving this order, [the officer]

'affirmatively assert[ed] authority over [Brown's] movements[.]'" *Id*. (citation omitted).

Nevertheless, "the seizure was justified because, by that time, [the officer] had developed

reasonable suspicion that Brown was engaged in a drug transaction with [the second transient]."

*Id*. at 1005.

*Brown* is patently different from this case and actually cuts against Yarofalchuw. Here,

Sgt. Cabrera never told Yarofalchuw to do anything nor did Sgt. Cabrera at any point touch

Yarofalchuw. There was no demand by Sgt. Cabrera to Yarofalchuw to "stand up and turn around."

In fact, after Yarofalchuw demanded Sgt. Cabrera leave the property, Sgt. Cabrera complied. Sgt.

Cabrera never affirmatively asserted any authority over Yarofalchuw's movements. At most, Sgt.

Cabrera sought to control Yarofalchuw's movements by allegedly obstructing the pathway. In fact,

like Brown feeling free to take a phone call, Yarofalchuw felt free to go back into his home and

then come out to confront Sgt. Cabrera. Taken as a whole including Sgt. Cabrera's conduct after

he parked his police vehicle, the facts do not suggest a show of authority. Yarofalchuw initially asserted there was an obstruction by Sgt. Cabrera's vehicle within the home or curtilage; however, after additional evidence was presented, including his own, there was at most a partial obstruction, and it was outside the curtilage. Because the facts are so different, Yarofalchuw cannot rely on *Brown* as clearly establishing law relevant to the facts here.

Yarofalchuw's reliance on *United States v. Orman*, 486 F.3d 1170 (9th Cir. 2007), is likewise not on point. In *Orman*, two police officers approached Orman who had been seen placing a handgun in his boot before entering a shopping mall. *Id*. at 1171. Orman was subsequently arrested and charged with being a felon in possession of a firearm. *Id*. at 1172. During the pendency of his case, Orman moved to suppress the seizure of the gun because, in part, "the encounter was not consensual and immediately custodial." *Id*. at 1173. The district court rejected this argument, found that the conversation was consensual, and ultimately denied the motion to suppress. *Id*. On appeal, the Ninth Circuit agreed. *Id*. at 1177. The Ninth Circuit determined that the officers never drew their guns, and the second officer was non-threatening, located at least 20 feet behind the first officer. *Id*. at 1175. "Additionally, the encounter was brief—lasting three to four minutes and occur[ing] in a public setting. Finally, the consensual nature of the encounter is not undermined by [the officer's] failure to expressly tell Orman that he was free to leave." *Id*. at 1175-76 (citation omitted). Thus, the Ninth Circuit concluded that the encounter was consensual and "[a] reasonable innocent person would not feel that he was being detained by a police officer who politely asked him if he could have a word with him and quickly inquired about a handgun." *Id*.

It is unclear how *Orman* helps Yarofalchuw given that the Ninth Circuit found no seizure. Insofar as Yarofalchuw uses *Orman* as a contrasting case, the Court is not convinced that *Orman* clearly establishes Sgt. Cabrera and Fitial's duties. A case need not be directly on point, but for a right to be clearly established, "existing precedent must have placed the statutory or constitutional

question beyond debate." *Wesby*, 138 S. Ct. at 589. Simply because there is a case that indicates what is *not* a seizure, does not mean that the case establishes what *is* a seizure.

Finally, Yarofalchuw cites the U.S. Supreme Court decision *Bostick*, 501 U.S. 429. However, the Supreme Court did not decide whether a seizure had occurred based on the facts in *Bostick*. *See id*. at 437 (refraining from deciding whether a seizure occurred and remanding to the state court to evaluate the seizure question under the correct legal standard of totality of the circumstances). Rather, *Bostick* outlined principles of Fourth Amendment law applicable to future cases. *See id*. at 439 (determining that random bus searches conducted pursuant to a passenger's consent is not per se unconstitutional). While these legal principles are helpful, the facts in *Bostick* are inapplicable to this case and therefore cannot be relied on as clearly establishing either Sgt. Cabrera or Officer Fitial's duties.

In summary, the facts in the case at bar are distinguishable from the cases cited to represent a show of authority and in fact tend to represent the contrary. There is no "robust consensus of caselaw" to indicate that either Defendant's conduct is clearly established to be a constitutional violation. Qualified immunity therefore applies, and Yarofalchuw's motion for reconsideration as to Fitial is denied.

## V.   CONCLUSION

Plaintiff Yarofalchuw has failed to meet his burden to demonstrate that Sgt. Cabrera and/or Officer Fitial's allegedly unconstitutional conduct was clearly established. Indeed, at a hearing on the matter, the Court continuously pressed Yarofalchuw to identify the robust consensus of case law to back his position. Yarofalchuw generally referred to the "show of authority" caselaw to support his arguments—such is insufficient to overcome the defense of qualified immunity. Additionally, the caselaw he did cite are inapplicable. Thus, the Court DENIES Yarofalchuw's motion for reconsideration as to Fitial's grant of qualified immunity (ECF No. 37), and GRANTS

both Sgt. Cabrera's motion for reconsideration (ECF No. 36) and Cross-MSJ (ECF No. 20) on

qualified immunity grounds in the alternative. Accordingly, the Court DENIES Yarofalchuw's

Motion for Summary Judgment (ECF No. 15). Judgment shall enter in favor of both defendants

Sgt. Cabrera and Officer Fitial.

   IT IS SO ORDERED this 14th day of August, 2023.

             _____

             RAMONA V. MANGLONA
             Chief Judge